IN THE UNITED STATES DISTRICT COURT FOR THE
                        EASTERN DISTRICT OF VIRGINIA

                        Alexandria Division


WESTERN INDUSTRIES-NORTH,        )
LLP,                             )
                                 )
        Plaintiff,               )
                                 )
            v.                   )    1:12cv177 (JCC/TRJ)
                                 )
BLAINE LESSARD, *et al.*,         )
                                 )
        Defendants.              )


                **M E M O R A N D U M   O P I N I O N**

        This matter is before the Court on Plaintiff Western

Industries-North, LLC's ("Western" or "Plaintiff") Emergency

Motion for Temporary Restraining Order ("TRO") [Dkt. 3].  Also

before the Court is a Motion to Dismiss filed by *pro se*

Defendants Blaine Lessard ("Lessard") and Darlene Marie Breck

("Breck") (collectively "Defendants").  [Dkts. 10, 17.]  For the

following reasons, the Court will grant Plaintiff's Motion and

deny Defendants' Motion.

                        **I.  Background**

        This case centers around "Dixie," a beagle trained in

the art of bedbug detection.  Plaintiff Western claims ownership

of Dixie and alleges that its former employee, Lessard, is

wrongfully withholding her.  Western also alleges that Lessard

has violated his employment agreement by engaging in the canine

                                1

bedbug detection business on his own behalf.  The following

facts as alleged in Plaintiff's Complaint, Emergency Motion for

a TRO, and sworn affidavits in support thereof are not disputed

unless otherwise noted.[1]

  A.   Factual Background

    Western provides pest detection and removal services

to customers in the mid-Atlantic region.  (Compl. [Dkt. 1] ¶ 2;

Pl.'s Mem. [Dkt. 5] at 3.)  One service offered by Western is

bedbug detection using specially trained scent dogs.  (Compl. ¶¶

6-7; Pl.'s Mem. at 3.)  Western entered the canine bedbug

detection business in February 2009 by acquiring a scent dog

named Dixie.  (Compl. ¶ 8; Pl.'s Mem. at 3.)  Western contends

that it purchased Dixie from trainers in Florida for $10,400.

(Compl. ¶ 8; Pl.'s Mem. at 3.)  Lessard claims that this fee was

purely for training services.  (Defs.' Mem. [Dkt. 11] at 5.)  In

March 2009, Western hired Lessard to work as Dixie's handler.

(Compl. ¶ 9; Pl.'s Mem. at 3.)

    On March 12, 2009, Lessard signed an employment

agreement in which he agreed, upon the termination of his

employment for any reason, to "immediately turn in to the

Company and account for all such equipment and property" that

---

[1] While the Court will note those facts disputed by Defendants, the only
evidence in opposition to Plaintiff's Motion is Defendants' unsworn Motion to
Dismiss and a host of unauthenticated documents.  Plaintiff's Motion, by
contrast, is properly supported by sworn affidavits.  This, of course, weighs
against Defendants.  *See Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d
14, 35 (D.D.C. 2001) (disregarding unauthenticated documentation supplied by
defendant on a motion for a preliminary injunction).

had come into his possession by reason of his employment. (Compl. ¶¶ 10, 12; Petouvis Decl. [Dkt. 5-3] Ex. B. ("Employment Agreement") ¶ 1.)  The employment agreement also contained non-solicitation and non-compete provisions.  Lessard agreed that for a period of two years after the termination of his employment for any reason, he would not "[d]irectly or indirectly solicit business from any customer of the Company where the purpose thereof is to provide, or offer to provide, the services of pest control, exterminating, fumigating or termite control either for himself[] or for others" (1) in any county or counties in the state in which he worked and in which he was assigned at any time during the two-year period preceding his termination or (2) from any customer of the Company with which he established contact while employed by the Company at any time during the two-year period preceding his termination. (Compl. ¶ 11; Employment Agreement ¶ 3(a).)  Lessard further agreed that for a period of two years after the termination of his employment he would not "[d]irectly or indirectly engage or concern himself[] in any manner whatsoever, in the carrying on or conducting the business of pest control, exterminating, fumigating and termite control as an owner, agent, servant, representative, or employee or as a member of partnership or as an officer, director or stockholder of any corporation" in any county or counties in the state in which he worked and in which

3

he was assigned during the two-year period preceding his termination or "[d]isclose to any person not employed by the Company any information concerning the business of the Company, its methods and systems, or the names of its customers." (Compl. ¶ 11; Employment Agreement ¶¶ 3(c), (d).)

On March 12, 2009, Lessard additionally signed an acknowledgement that he had received a copy of the Western Employee Handbook and was responsible for familiarizing himself with its contents.  (Compl. ¶ 14; Petouvis Decl. Ex. C.)  In a section entitled "OUTSIDE EMPLOYMENT – MOONLIGHTING," the handbook states that "Employees are not allowed to work for another pest control or fumigation firm or to be in business for themselves in the pest control or fumigation business. . . . Violation of this rule will result in immediate termination." (Compl. ¶ 14; Petouvis Decl. Ex. C.)

Since acquiring Dixie in February 2009, Western has steadily expanded its canine bedbug detection business by acquiring new dogs and hiring additional handlers.  (Compl. ¶ 15; Pl.'s Mem. at 5.)  Western has invested substantial resources in developing this business.  (Compl. ¶ 16; Pl.'s Mem. at 6.)  In addition to the costs associated with acquiring, training, certifying, boarding, and providing veterinary care for the scent dogs, Western paid to train the handlers as well. (Compl. ¶ 16; Pl.'s Mem. at 6.)  Lessard disputes this, and

4

contends that he paid for such costs associated with Dixie.[2]
(Defs.' Mem. at 3-4, 6.)

Western actively promoted its canine bedbug
detection business through media placements featuring both Dixie
and Lessard.  (Compl. ¶ 16; Pl.'s Mem. at 6.)  As of January
2012, Western owned four scent dogs and employed four handlers.
(Compl. ¶ 16; Pl.'s Mem. at 6.)  In each of the last two years,
Dixie alone has generated annual gross revenues in excess of
$100,000.  (Compl. ¶ 17; Pl.'s Mem. at 6.)

Although handlers are permitted to solicit new
business for Western, they receive the majority of their work
assignments from the company.  (Compl. ¶ 19; Pl.'s Mem. at 6.)
Plaintiff contends that in the course of his employment, Lessard
acquired confidential information regarding Western's canine
bedbug detection business.  (Compl. ¶ 20; Pl.'s Mem. at 7.)
Lessard allegedly became acquainted with Western's pricing
models for its canine bedbug detection services as well as the
identities of its customers and their experiences with
infestations.  (Compl. ¶¶ 21-22; Pl.'s Mem. at 7.)  Lessard
denies this.  (Defs.' Mem. at 6.)

In November 2011, Western received information that
Lessard was using Dixie to provide canine bedbug detection

---

[2] Plaintiff filed a supplemental declaration which includes a signed form
authorizing monthly reimbursement of $50 to Lessard for boarding Dixie.
(Sullivan Decl. [Dkt. 15-1] Ex. A.)  Lessard contends that he never received
these reimbursements and that in any event this amount was insufficient.
(TRO Hr'g Tr. [Dkt. 24] 8:3-15, Mar. 9, 2012.)

services for his own financial benefit.  (Compl. ¶ 24; Pl.'s Mem. at 8.)  Western first learned of this when Lessard inadvertently faxed a worksheet to Western's office which revealed that, on a day he was on leave from work, he had taken Dixie to Pennsylvania to provide bedbug detection services for a business that was not a Western customer.  (Compl. ¶ 24; Pl.'s Mem. at 8.)  Lessard denies this.  (Defs.' Mem. at 6.)

In February 2012, Western discovered a website for a competing canine bedbug detection company in Maryland operating under the name American Canine Scent Detection ("ACSD"). (Compl. ¶ 25; Pl.'s Mem. at 8.)  The website featured both Lessard and Dixie, and cited their extensive experience in the canine bedbug detection industry.  (Compl. ¶ 26; Pl.'s Mem. at 8.)  Lessard's wife, Darlene Marie Breck, registered the trade name "American Canine Scent Detection" on November 30, 2010. (Compl. ¶ 25; Pl.'s Mem. at 10.)  As recently as February 15, 2012, Lessard's "Linked In" page indicated that he is a "Master Canine Handler and Trainer at American Canine Scent Detection." (Pl.'s Mem. Ex. F.)  The "Linked In" page also contains ACSD's telephone number as well as a link to the ACSD website.  (Compl. ¶ 28; Pl.'s Mem. at 10.)

Upon discovery of this website, Western decided to terminate Lessard's employment and recover Dixie.  (Compl. ¶ 26; Pl.'s Mem. at 8.)  On February 10, 2012, Lessard met with James

Bankhead, manager of Western's branch office in Fairfax, Virginia. (Compl. ¶ 27; Pl.'s Mem. at 8.) Bankhead informed Lessard that his employment was being terminated and asked him to return Dixie. (Compl. ¶ 27; Pl.'s Mem. at 8.) Lessard refused, telling Bankhead, "You're not getting the dog. There's just no way you're gonna get the dog." (Compl. ¶ 27; Pl.'s Mem. at 8-9.)

ACSD continues to offer canine bedbug detection services. (Compl. ¶ 28; Pl.'s Mem. at 9.) ACSD advertises that it provides canine bedbug detection services to "Hotels, Motels, Hospitals, Senior Homes, Apartments, Theaters, Residential, [and] Offices," which are the same types of properties that Lessard inspected while employed at Western. (Compl. ¶ 29; Pl.'s Mem. at 9; Petouvis Decl. Ex. E at 2.)

The website indicates that ACSD uses dogs trained by "Blaine Lessard, Master Canine Trainer and Handler, and one of the most experienced authorities in the canine bed bug scent industry." (Compl. ¶ 28; Pl.'s Mem. at 9; Petouvis Decl. Ex. E at 5.) The website also contains a promotional "News Room," which features stories about Dixie and Lessard that date from when Lessard was employed by Western. (Compl. ¶ 28; Pl.'s Mem. at 9; Petouvis Decl. Ex. E at 9-10.) One of the "News Room" articles claims that "American Canine Scent Detection has been up and down the east coast, primarily in New York" and that

"American Canine Scent Detection has searched over 70,000 rooms on the east coast from Manhattan to Virginia Beach." (Compl. ¶ 30; Pl.'s Mem. at 9; Petouvis Decl. Ex. E at 13.) During the two years preceding his termination, Lessard provided canine bedbug detection services to Western customers in Virginia, Maryland, the District of Columbia, Delaware, Pennsylvania, New York, and Connecticut. (Compl. ¶ 31; Pl.'s Mem. at 10.)

   B.   Procedural Background

      Plaintiff filed its Complaint in this Court on February 23, 2012. [Dkt. 1] On the same day, Plaintiff filed an Emergency Motion for a TRO and an Emergency Motion for a Preliminary Injunction. [Dkts. 3, 4.] Plaintiff presently seeks three forms of injunctive relief: (1) to require Lessard to immediately return Dixie; (2) to enjoin Lessard from directly or indirectly engaging in, or offering to engage in, the business of providing canine bedbug detection services in any counties (including the District of Columbia) in which he performed work on behalf of Western during the two-year period preceding his termination; and (3) to enjoin Lessard from using or disclosing any confidential information in violation of his employment agreement. Defendants filed a Motion to Dismiss on February 27, 2012 [Dkt. 10], which they supplemented on March 1, 2012 [Dkt. 17]. Plaintiff's Emergency Motion for a TRO and Defendants' Motion to Dismiss are before the Court.

## II.   Standard of Review

A.   TRO

"The standard for granting either a [temporary restraining order ("TRO")] or a preliminary injunction is the same." *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) (citations omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20)), *vacated on other grounds*, 130 S.Ct. 2371 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010).[3]

Usually, a preliminary injunction "protect[s] the status quo . . . to prevent irreparable harm during the pendency of a lawsuit [and] ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003),

---

[3] Plaintiff misstates the proper standard by citing *Ancora Capital & Management Group, LLC v. Gray*, 55 F. App'x 111, 113 (4th Cir. 2003), a case which utilized the balancing approach set forth in *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977).  In the wake of the Supreme Court's decision in *Winter*, *Blackwelder* "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit." *Real Truth About Obama*, 575 F.3d at 347.  Contrary to Plaintiff's assertion, a party seeking the preliminary injunction must demonstrate by "a *clear showing* that it is *likely* to succeed at trial on the merits." *Id.* at 351 (emphases in original).

*abrogated on other grounds by eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).  However, mandatory preliminary injunctions, which compel action, "do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (citing *Interstate Commerce Comm'n v. Baltimore & Annapolis R.R. Co.*, 64 F.R.D. 337 (D.Md. 1974)).  Therefore, "a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Microsoft*, 333 F.3d at 526.

   B.   Motion to Dismiss

     Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  A court reviewing a complaint on a Rule 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff. *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).

     A court must also be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation omitted).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, *id.*, and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.  Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 S.Ct. at 1949-50.

C.   *Pro Se* Litigant

The Court construes the Defendants' *pro se* filings in this case more liberally than those drafted by an attorney.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).  However, the liberal construction afforded *pro se* pleadings does not mean that courts are "required to construct a [*pro se*] party's legal arguments for him," *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993), or "conjure up questions never squarely presented," *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

**III.   Analysis**

A.   Governing Law

As an initial matter, the Court must determine what law governs Plaintiff's claims.  This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds $75,000. (Compl. ¶¶ 1, 3-4.)  A federal court sitting in diversity must apply the substantive law of the forum state, including its choice of law rules.  *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007).  With respect to Plaintiff's tort claims, Virginia applies the rule of *lex loci delicti*, *i.e.*, the law of the place of the wrong governs.  *See Ford v. Wellmont Health Sys.*, No. 2:09cv55, 2009 WL 4544099, at *15 (W.D. Va. Nov. 30, 2009) (applying *lex loci delicti* rule to

conversion claim); *Bank of Am. v. Musselman*, 222 F. Supp. 2d 792, 796 (E.D. Va. 2002) (same for breach of fiduciary duty claim).  Because Plaintiff alleges that a substantial part of the acts giving rise to its claims arose in Virginia, including Lessard's refusal to return Dixie (Compl. ¶¶ 5, 27) the Court will apply Virginia law to Plaintiff's tort claims.

With respect to Plaintiff's breach of contract claim, the Court notes that the employment contract at issue contains a New Jersey choice of law provision.  (*See* Employment Agreement ¶ 4.)  Virginia law looks favorably upon choice-of-law clauses in a contract, giving them full effect except in unusual circumstances, *Colgan*, 507 F.3d at 275, none of which appear to exist in this case.  Thus, New Jersey law governs Plaintiff's breach of contract claim.

B.   <u>TRO</u>

1.   <u>Likelihood of Success on the Merits</u>

A plaintiff seeking a TRO must first establish that it is likely to succeed on the merits.  Here, Plaintiff brings four claims: Count I, for conversion, (Compl. ¶¶ 32-40); Count II, for breach of contract, (Compl. ¶¶ 41-45); Count III, for breach of the fiduciary duty of loyalty, (Compl. ¶¶ 46-49); and Count IV, for tortious interference with business expectancy (Compl. ¶¶ 50-62).  Where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to

justify injunctive relief.  *See McNeil-PPC v. Granutec, Inc.*, 919 F. Supp. 198, 203 n.2 (E.D.N.C. 1995).  In this case, Plaintiff only addresses two of its four claims: conversion and breach of contract.  The Court will begin with the conversion claim.

### a.  Count I: Conversion

Plaintiff's Count I alleges conversion.  "In Virginia, a party bringing claims for conversion must allege facts that show any wrongful exercise or assumption of authority over another's goods, depriving him of their possession as well as any act of dominion wrongfully exerted over property in denial of the owner's rights."  *Global Bankcard Servs., Inc. v. Global Merchant Servs., Inc.*, No. 1:11-cv-00110, 2011 WL 2268057, at *5 (E.D. Va. June 7, 2011) (citing *Hewlette v. Hovis*, 381 F. Supp. 2d 332, 336 (E.D. Va. 2004)).

Here, it is likely that Plaintiff will succeed on the merits of its conversion claim.  Plaintiff has submitted evidence showing that it paid a trainer in Florida $10,400 for Dixie.  Moreover, in his employment agreement, Lessard promised to return all of Western's property upon the termination of his employment.  Nonetheless, Lessard continues to hold Dixie despite Plaintiff's demand for her return.  Consequently, Lessard has wrongly assumed control over Dixie.

In their Motion to Dismiss, Defendants unleash a series of barebones assertions that they are the rightful owners of Dixie.  For example, Defendants nakedly contend that Lessard "assumed" ownership of Dixie from the training academy in Florida, and that the academy "transferred ownership directly" to Lessard.  (Defs.' Mem. at 3.)  Their Motion is accompanied by a litter of unauthenticated documents, none of which support this assertion.[4]  Lessard also claims that he arranged for Dixie's travel to Maryland, purchased dog supplies, boarded Dixie, provided her with additional training, and kept her testing and certifications up-to-date.  (Defs.' Mem. at 3-4.) These acts, while commendable, do not establish that Lessard possesses an ownership interest in Dixie.  To conclude otherwise would be to let the tail wag the dog.  Lastly, Lessard contends that "Dixie was a rescue dog with no value," "Western abandoned Dixie with Lessard, accepting no responsibility for Dixie's care and maintenance" and that "Western's transaction with Florida Canine Academy was for training services."  (Defs.' Mem. at 5.) Obviously, Defendants' claim that Dixie had no value is belied by the $10,400 paid by Plaintiff.  While the receipt submitted by Plaintiff says that the $10,400 price "includes [t]raining and [c]ertification of a dog for bedbug detection," it by no

---

[4] The closest Lessard comes to producing evidence of ownership is Dixie's microchip registration, in which he is listed as owner.  (Defs.' Mem. Ex. H.) Like the other exhibits to Defendants' Motion to Dismiss, this document is unauthenticated.  Lessard also fails to present evidence that Western ever saw the microchip registration or somehow consented to his claim of ownership.

means appears that the entire $10,400 was for training services. (*See* Petouvis Decl. Ex. A.)

In short, Defendants' dogged attempt to demonstrate ownership of Dixie is wholly unconvincing.  As such, the Court concludes that Plaintiff's conversion claim will likely succeed on the merits.

b.    Count II: Breach of Contract

Plaintiff's Count II alleges breach of contract.  In New Jersey, a breach of contract claim requires proof of three elements:  (1) a valid contract; (2) defective performance by the defendant; and (3) resulting damages. *Coyle v. Englander's*, 199 N.J. Super. 212, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div. 1985).  Moreover, a noncompetition agreement will be given effect if it is reasonable in view of all the circumstances of a particular case. *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 56 (N.J. 1970).  A noncompetition agreement will generally be reasonable where it (1) protects the legitimate interests of the employer; (2) imposes no undue hardship on the employee; and (3) is not injurious to the public. *Id.*  "Even if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity" under what is known as the "blue pencil" rule. *Coskey's Television & Radio Sales &*

*Serv., Inc.*, 253 N.J. Super. 626, 602 A.2d 789, 793 (N.J. Super.
Ct. App. Div. 1992) (citing *Solari*, 264 A.2d at 53).

New Jersey courts recognize that legitimate interests
of the employer include confidential information and customer
relationships. *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274
A.2d 577, 581 (N.J. 1977). Here, Plaintiff attests that Lessard
had access to confidential information, including pricing models
and customer lists. (Petouvis Decl. ¶¶ 17-19.) Defendants'
unsworn assertion otherwise is not compelling. (Defs.' Mem. at
6.) In cases where the employer's interests are strong, such as
cases involving confidential information, a court will enforce a
noncompetition agreement. *See Ingersoll-Rand Co. v. Ciavatta*,
110 N.J. 609, 542 A.2d 879, 893 (N.J. 1988).

As to undue hardship, courts will consider "the nature
of the profession, the duration of the restriction, the
geographic area of the restriction and the type of restriction."
*Maw v. Advanced Clinical Commc'ns, Inc.*, 359 N.J. Super. 420,
820 A.2d 105, 115 (N.J. Super. Ct. App. Div. 2003), *rev'd on
other grounds*, 179 N.J. 439, 846 A.2d 604 (N.J. 2004). Here,
the non-compete and non-solicitation provisions apply for a two-
year period after employment, a period that New Jersey courts
have found to be reasonable. *See, e.g.*, *Schuhalter v. Salerno*,
279 N.J. Super. 504, 653 A.2d 596, 601 (N.J. Super. Ct. App.
Div. 1995) (finding accounting partner's two-year restriction a

17

"modest imposition"); *A.T. Hudson & Co., Inc. v. Donovan*, 216
N.J. Super. 426, 524 A.2d 412, 413, 415-16 (N.J. Super. Ct. App.
Div. 1987) (enforcing two-year restriction prohibiting former
principal from soliciting consulting company's customer
relationships).

Lessard's employment agreement precludes him from
soliciting pest control business from customers in the states in
which he worked and was assigned during the two-year period
preceding his termination.  (Employment Agreement ¶ 3(a).)
Lessard also may not solicit pest control business from any
customer with which he established contact during the two-year
period preceding his termination, without geographic limitation.
(*Id.*)  New Jersey courts have upheld similar provisions.  *See*
*Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *7
(D.N.J. June 15, 2009); *A.T. Hudson*, 524 A.2d at 415-16.  While
New Jersey courts seem to require geographic limitations for
non-compete clauses, they do not appear necessary for non-
solicitation provisions.  *See Platinum Mgmt., Inc. v. Dahms*, 285
N.J. Super. 274, 666 A.2d 1028, 1040 (N.J. Super. Ct. Law Div.
1995); *Mailman, Ross, Toyes & Shapiro v. Edelson*, 183 N.J.
Super. 434, 444 A.2d 75, 79 (N.J. Super. Ct. Ch. Div. 1982) ("To
impose a geographical limitation on a covenant which seeks to
protect an established clientele instead of an area of non-
competition would not make the burden imposed on the employee by

a covenant 'reasonable' but would merely mandate an unwarranted change in the nature of the interest protected.")

"In considering whether the geographic scope of a non-compete agreement imposes an undue hardship, a court should consider 'the likelihood of the employee finding work in his field elsewhere' and whether the employee ended the employment relationship, thus bringing the hardship on himself." *Trico*, 2009 WL 1687391, at *7 (quoting *Karlin v. Weinberg*, 77 N.J. 408, 390 A.2d 1161, 1169 (N.J. 1978)). "There does not seem to be any New Jersey case which imposed a per se limit on the geographic scope that a covenant not to compete may cover, and some courts have enforced non-compete clauses with wide geographic scopes." *Id.* (collecting cases).

The non-compete provision at issue here precludes Lessard from engaging in the pest control business in any state in which he worked and was assigned during the two-year period preceding his termination. (Employment Agreement ¶ 3(c).) Those states include Virginia, Maryland, the District of Columbia, Delaware, Pennsylvania, New York, and Connecticut. (Compl. ¶ 31; Pl.'s Mem. at 10.) While this geographic scope strikes the Court as relatively broad, the Court possesses the authority under New Jersey law to limit its application. *See Coskey's*, 602 A.2d at 793. Moreover, at this time Plaintiff merely seeks to enjoin Lessard from engaging in the canine

19

bedbug detection business in any counties (including the
District of Columbia) in which he performed work on behalf of
Western during the two years preceding his termination.  The
Court finds such a restriction reasonable.  Lessard contends
otherwise, and at oral argument stated that he is currently
unemployed.  (TRO Hr'g Tr. [Dkt. 24] 7:24, Mar. 9, 2012.)
However, Lessard also asserts in his Motion to Dismiss that he
has owned and operated his own kennel since 1983 and provides
training for obedience, search and rescue, agility, and show
dogs.  (Defs.' Mem. at 1.)  The non-compete provision in
Lessard's employment agreement does not preclude him from
engaging in these activities.

Turning to the third factor, the public interest is
not a major concern.  The public interest is an important
consideration in "cases primarily concerned with the rights of
the public to have free access to the advice of professionals
licensed by the state." *Coskey's*, 602 A.2d at 793 (collecting
cases concerning physicians, attorneys, and accountants).  "To
the extent that the public interest is considered in cases not
involving licensed professionals, courts consider the demand for
services offered by the employee and the likelihood that those
services can be provided by others working in the area." *Trico*,
2009 WL 1687391, at *8 (citing *Karlin*, 390 A.2d at 1169-70).
There is no reason to believe that the public will have trouble

20

locating canine bedbug detection services if Lessard is precluded from working in that industry within the temporal and geographic limitations prescribed by his employment agreement. Plaintiff is therefore likely to show the existence of a valid contract.

While Plaintiff does not allege that Lessard has solicited or engaged in business with its customers, it appears likely that Lessard is breaching the non-compete provision of his employment agreement.  ACSD is indisputably in the canine bedbug detection business, and ACSD's website reveals that it operates in the same geographic region as Western.  Moreover, Lessard's "Linked In" page indicates that he is a "Master Canine Handler and Trainer at American Canine Scent Detection." Lessard's involvement with ACSD also makes it likely that he has shared confidential information regarding Western with people outside the company, including his wife, who is the registered owner of ACSD's trade name.  Finally, Plaintiff alleges that Lessard's breach of his employment agreement has caused it damages, including the loss of goodwill.

For these reasons, the Court finds it likely that Plaintiff's breach of contract claim will succeed on the merits.

### 2.  Irreparable Harm

The plaintiff must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief."

21

*Real Truth About Obama*, 575 F.3d at 347 (emphasis added).
"[G]enerally 'irreparable injury is suffered when monetary
damages are difficult to ascertain or are inadequate.'" *Multi-*
*Channel TV Cable Co. v. Charlottesville Quality Cable Operating*
*Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v.*
*Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)).  "[W]hen the
failure to grant preliminary relief creates the possibility of
permanent loss of customers to a competitor or the loss of
goodwill, the irreparable injury prong is satisfied." *Id.* at
552 (citation omitted).  Irreparable harm must be "neither
remote nor speculative, but actual and imminent." *Direx Israel,*
*Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.
1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888
F.2d 969, 975 (2d Cir. 1989)).

        Plaintiff argues that the lost business due to
Lessard's refusal to return Dixie, in terms of lost future
opportunities and customer goodwill, cannot readily be
quantified.  Plaintiff also submits that it has promoted Dixie
by name, and that when potential customers conduct online
research for canine bedbug detection services, they are likely
to come across articles about Dixie and which also reference
Lessard -- articles published as a result of Plaintiff's media
placements.  Courts have held that "loss of clients' goodwill
and future business . . . [is] difficult, if not impossible, to

measure fully." *Fidelity Global Brokerage Grp., Inc. v. Gray*, No. 1:10cv1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (quoting *IDS v. Sun Am.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997)); *see also Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) ("[R]elations with customers and investors, [and] the good will built up by a heretofore successful enterprise" is "incalculable not incalculably great or small, just incalculable."; *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977) (holding that the award of damages based on "past profits" would not adequately compensate plaintiff for harm to goodwill, which was "incalculable"), *abrogated on other grounds*, *Real Truth About Obama*, 575 F.3d at 346.

Plaintiff will clearly lose future business so long as Defendants hold Dixie, and Plaintiff alleges that the business it has derived from Dixie is substantial.  In his employment agreement, Lessard promised to return all company property upon his termination.  (Employment Agreement ¶ 1.)  Rather than return her, Defendants are actively promoting Dixie on the ACSD website in order to generate their own business.  In *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 439, 447 (W.D.N.C. 2002), the court granted a preliminary injunction requiring defendants to return any documents, computer disks, or other material which rightfully belonged to the plaintiff where

the defendants signed employment agreements agreeing to return any and all records relating to clients.  While a dog is admittedly different from documents and computer disks, Dixie is perhaps more important to facilitating business than the records involved in *UBS PaineWebber*.  Simply put, without Dixie, Plaintiff cannot generate *any* business with her.

In a different context, the Eastern District of Pennsylvania granted a preliminary injunction ordering that the defendant hand over possession of three dogs.  *See Sixth Angel Shepherd Rescue, Inc. v. Bengal*, No. 10-1733, 2010 WL 2164521, at *4 (E.D. Pa. May 27, 2010), *aff'd* 448 F. App'x 252 (3d Cir. 2011) (unpublished).  There, the plaintiff was an organization which rescued dogs from dangerous conditions and attempted to place them in permanent homes.  *Id.* at *1.  Before the plaintiff could receive three dogs it was attempting to rescue from North Carolina, the dogs were intercepted by the defendant due to allegedly subpar transportation conditions.  *Id.*  In granting injunctive relief, the court noted that "[o]ne cross-eyed lab is not the same as the next, making the property irreplaceable." *Id.* at *4.  The same is true for a bedbug-sniffing beagle.

It is also notable that as of January 2012, Western owned four scent dogs and handlers.  Thus, Dixie's absence deprives Plaintiff of a substantial chunk of its business.  The Court finds that this situation presents the type of exigency

24

that warrants mandatory injunctive relief.  *See Rauch Indus., Inc. v. Radko*, No. 3:07-cv-197, 2007 WL 3124647, at *2, *5-6 (W.D.N.C. Oct. 25, 2007) (recognizing heightened standard for mandatory injunctive relief and requiring defendant to fulfill contractual obligation and turn over customer list).

Plaintiff has also demonstrated that it will suffer irreparable harm if Lessard violates the non-compete provisions of his employment agreement.  Plaintiff contends that Lessard possesses confidential information relating to its pricing and customers, which gives him an unfair advantage in directly competing with Western.  While Defendants dispute this, at the very least Lessard has knowledge about the customers he serviced while employed by Western.  Given the nature of bedbug infestation, this information is likely nonpublic and confidential.  Moreover, Plaintiff submits that Lessard never worked as a handler of bedbug scent dogs prior to his employment, and that it provided him and Dixie with training. *See ISCO Indus., LLC v. Erdle*, No. 5:11-cv-552, 2011 WL 5101599, at *3-4 (E.D.N.C. Oct. 26, 2011) (finding irreparable harm and ordering defendant to comply with noncompetition agreement where plaintiff contended that it "made significant investments of time and money into training [defendant] to become knowledgeable about its business, products, and capabilities" and defendant "inevitably had access to detailed, confidential information

relating to [plaintiff's] operations, sales, and marketing strategies"). Lastly, Lessard is in a unique position relative to Western given the media placements it put forth promoting him and Dixie. *See Rauch*, 2007 WL 3124647, at *2 (noting that alleged breach of non-compete agreement was likely to cause irreparable harm given the defendant's unique relationship with the plaintiff). Even after Dixie is returned to Plaintiff, those media placements will still exist, and will likely direct potential customers to Lessard rather than Western.

In sum, the Court finds that Plaintiff has made a clear showing that it will suffer irreparable harm if it is not granted the injunctive relief it seeks.

### 3.   Balance of Equities/Public Interest

In balancing the equities, the Court finds that the harm to Plaintiff substantially outweighs the harm to Defendants. While Defendants have provided care for Dixie, they present no convincing evidence demonstrating that they possess an ownership interest in her. Their assertions otherwise are all bark and no bite. Plaintiff, by contrast, is being deprived of unique property.

As for enjoining Lessard from continuing to work in the canine bedbug detection business, the balance of equities also tips in favor of injunctive relief. If it is true that Lessard is contractually barred from using Plaintiff's

confidential information and operating such a business in the same geographic region as Plaintiff, then he loses nothing by an injunction prohibiting him from doing so.  And, at this time Western is not seeking to enforce the non-compete provisions to their full extent but rather asks that Lessard be enjoined from providing canine bedbug detection services in the counties where he worked during the two-year period preceding his termination. Plaintiff, on the other hand, argues that it will lose significant business if Lessard continues to misappropriate and dilute its goodwill in contravention of his employment agreement.

Lastly, the public interest favors an injunction in this case.  First, the public interest is served by returning Dixie to Plaintiff.  Again, Defendants have failed to demonstrate that they possess an ownership interest in Dixie. Moreover, "public interest favors the protection of confidential business information and the enforcement of valid contracts." *ABT, Inc. v. Juszczyk,* No. 5:09cv119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010).  In short, considering the legitimate interests at stake, the balance of equities and the public interest both warrant an injunction here.

C.   Motion to Dismiss

In their Motion to Dismiss, Defendants fail to establish a legal deficiency in Plaintiff's Complaint.  Rather,

Defendants make a host of factual assertions.  Of course, at this stage of the litigation, the Court must accept all well-pleaded allegations in the Complaint as true, and construe them in a light most favorable to Plaintiff.  *See Randall*, 30 F.3d at 522.  As for the numerous exhibits Defendants have submitted, the Court may not consider evidence outside the pleadings when ruling on a Rule 12(b)(6) motion.  *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  And, even were the Court to treat Defendants' Motion to Dismiss as one for summary judgment, the exhibits still could not be considered because they are unsworn and unauthenticated.  *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("[U]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").  Accordingly, Defendants' Motion to Dismiss will be denied.

### IV.  Conclusion

After pawing through the record and sniffing out the relevant law, the Court will grant Plaintiff's Motion and deny Defendants' Motion.

/s/
_____

March 13, 2012                James C. Cacheris
Alexandria, Virginia      UNITED STATES DISTRICT COURT JUDGE