IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| WESTERN INDUSTRIES-NORTH, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 1:12cv177 (JCC/TRJ) ) |
| BLAINE LESSARD, *et al.*, | ) ) |
| Defendants. | ) |

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff Western Industries-North, LLC's ("Western" or "Plaintiff") Emergency Motion for a Preliminary Injunction. [Dkt. 4.] For the following reasons, the Court will grant in part and deny in part Plaintiff's Motion.

### I.  Background

The basic facts of this case are recounted in the Court's Memorandum Opinion dated March 13, 2012 (the "Opinion"), familiarity with which is presumed. (*See* Mem. Op. [Dkt. 24].) The case arises out of a dispute between Plaintiff Western and its former employee, Blaine Lessard ("Lessard"), who allegedly converted a scent dog named "Dixie" rightfully owned by Western, and who allegedly violated a non-compete provision in his employment agreement by engaging in the canine bedbug detection

1

business on his own behalf.  On March 9, 2012, the Court granted Plaintiff's Emergency Motion for a TRO [Dkt. 3] and denied *pro se* Defendants' Motion to Dismiss [Dkts. 10, 17].  (*See* Order [Dkt. 23].)  The Court ordered Defendants to return Dixie to Western and enjoined Lessard from engaging in the canine bedbug detection business in any cities or counties in which he performed work for Western during the two years preceding his termination and from disclosing any confidential and/or proprietary information in violation of his employment agreement.  (*Id.*)  Defendants thereupon retained counsel and on March 14, 2012, filed an opposition to Plaintiff's Emergency Motion for a Preliminary Injunction as well as two sworn affidavits.  [Dkt. 29.]  A hearing was held on March 16, 2012, which included the testimony of three witnesses.  Plaintiff's Motion is before the Court.

## II.  Standard of Review

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20)), *vacated on*

*other grounds*, 130 S.Ct. 2371 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010).

Usually, a preliminary injunction "protect[s] the status quo . . . to prevent irreparable harm during the pendency of a lawsuit [and] ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).  However, mandatory preliminary injunctions, which compel action, "do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (citing *Interstate Commerce Comm'n v. Baltimore & Annapolis R.R. Co.*, 64 F.R.D. 337 (D.Md. 1974)).  Therefore, "a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Microsoft*, 333 F.3d at 526.[1]

---

[1] Here, Plaintiff seeks both mandatory and prohibitive injunctive relief. Plaintiff's request for possession of Dixie compels action on the part of Defendants and hence is mandatory.  To secure this relief, Plaintiff must therefore satisfy the heightened showing.  In contrast, Plaintiff's request for a preliminary injunction enjoining Lessard from engaging in the canine bedbug detection business in certain counties and from disclosing confidential information is prohibitive.  With respect to this request, the normal analysis for a preliminary injunction applies. *See Cornwell v. Sachs*, 99 F. Supp. 2d 695, 703 (E.D. Va. 2000) (differentiating the applicable standards of review where a plaintiff seeks both mandatory and prohibitive injunctive relief).

### III. Analysis

    A.    <u>Likelihood of Success on the Merits</u>

A plaintiff seeking a preliminary injunction must first establish that it is likely to succeed on the merits. Here, Plaintiff brings four claims: Count I, for conversion, (Compl. [Dkt. 1] ¶¶ 32-40); Count II, for breach of contract, (Compl. ¶¶ 41-45); Count III, for breach of duty of loyalty, (Compl. ¶¶ 46-49); and Count IV, for tortious interference with business expectancy (Compl. ¶¶ 50-62). In general, where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief. *McNeil-PPC v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995) (citing *Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1292 n.4 (M.D.N.C. 1989)), *aff'd*, 892 F.2d 74 (4th Cir. 1989). However, "in cases where the request for preliminary relief encompasses both an injunction to maintain the status quo and to provide mandatory relief, as here, the two requests must be reviewed separately, with the request for mandatory relief being subjected to a more exacting standard of review." *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 703 (E.D. Va. 2000) (emphasis omitted) (quoting *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232, 1992 WL 67358, at *7 (4th Cir. Apr. 6, 1992) (unpublished table decision)). With this principle in mind, the Court will examine the likelihood of success on the

merits both as to Plaintiff's conversion claim, which is the basis for the mandatory injunctive sought, as well as its breach of contract claim, which is the basis for the prohibitive injunctive relief sought. These are the only two claims addressed by the parties. The Court will begin by examining the conversion claim.

### 1. Count I: Conversion

Plaintiff's Count I alleges conversion. "In Virginia, a party bringing claims for conversion must allege facts that show any wrongful exercise or assumption of authority over another's goods, depriving him of their possession as well as any act of dominion wrongfully exerted over property in denial of the owner's rights." *Global Bankcard Servs., Inc. v. Global Merchant Servs., Inc.*, No. 1:11-cv-00110, 2011 WL 2268057, at *5 (E.D. Va. June 7, 2011) (citing *Hewlette v. Hovis*, 381 F. Supp. 2d 332, 336 (E.D. Va. 2004)).[2]

The likelihood of success on the merits required for mandatory injunctive relief has been described as a showing "clear and convincing on the part of the plaintiff." *Tiffany*, 1999 WL 67358, at *8 (quoting *Mycalex Corp. of Am. v. Pemco Corp.*, 159 F.2d 907, 912 (4th Cir. 1947)). Thus, "if there is doubt as to the probability of plaintiff's ultimate success, a request for preliminary mandatory relief must be denied."

---

[2] As explained in the Court's Opinion, Virginia law applies to Plaintiff's tort claims. (*See* Mem. Op. at 12.)

5

*Cornwell*, 99 F. Supp. 2d at 704 (internal quotation marks omitted).

In granting Plaintiff's Motion for a TRO, the Court found it likely Plaintiff would succeed on the merits of its conversion claim, noting the receipt showing that Plaintiff paid $10,400 to a trainer in Florida. At that point in time, Defendants failed to file an opposition to Plaintiff's Motion, instead relying on their unsworn Motion to Dismiss and unauthenticated documents, a fact which weighed against them. (Mem. Op. at 2 n.1.) Lessard now submits a sworn affidavit, accompanied by a series of exhibits in which Lessard is listed as owner of Dixie. (*See* Lessard Decl. Ex. D [Dkt. 29-5].) Among these documents are a microchip registration, health certificates, and veterinary bills.

Lessard also testified at the preliminary injunction hearing that he obtained liability insurance on Dixie, and that proof of ownership is required in order to obtain such an insurance policy. Defendants submitted as evidence a fax transmitted to an insurance carrier, attached to which was a health certificate indicating Lessard as Dixie's owner. (Defs.' Ex. 4.) William Sullivan, Western's Director of Operations, could not affirmatively testify that Western possessed liability insurance for Dixie.

Lastly, Lessard provided testimony relating to the customary procedures that are followed in purchase and sale transactions involving dogs.  For example, Lessard testified and presented evidence concerning his sale of a bedbug scent dog named "Duke" to Western.  This transaction included a bill of sale in which the dog was identified by name and registration number.  (Defs.' Ex. 2.)  Western has not provided similar documentation with respect to Dixie.  The invoice from the academy in Florida, which Plaintiff submits as evidence, did not contain Dixie's name or her registration number.

The evidence presented by Defendants in their opposition and at the preliminary injunction hearing raises a sufficient question as to Dixie's ownership to warrant denial of the mandatory injunctive relief sought.  Based on the record before it, the Court simply cannot conclude that Plaintiff has made a clear and convincing showing that it owns Dixie.  As such, Plaintiff's Motion is denied as to its request for the return of Dixie.

2. Count II: Breach of Contract

Plaintiff's Count II alleges breach of contract.  In New Jersey, a breach of contract claim requires proof of three elements:  (1) a valid contract; (2) defective performance by the defendant; and (3) resulting damages.  *Coyle v. Englander's*, 199 N.J. Super. 212, 488 A.2d 1083, 1088 (N.J. Super. Ct. App.

7

Div. 1985).[3]  Moreover, a noncompetition agreement will be given effect if it is reasonable in view of all the circumstances of a particular case.  *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 56 (N.J. 1970).  A noncompetition agreement will generally be reasonable where it (1) protects the legitimate interests of the employer; (2) imposes no undue hardship on the employee; and (3) is not injurious to the public.  *Id.*  "Even if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity" under what is known as the "blue pencil" rule.  *Coskey's Television & Radio Sales & Serv., Inc.*, 253 N.J. Super. 626, 602 A.2d 789, 793 (N.J. Super. Ct. App. Div. 1992) (citing *Solari*, 264 A.2d at 53).

In its Opinion, the Court held that it was likely Western would prove the existence of a valid contract.  In his opposition, Lessard contends that there is no confidential information at stake.  But, as the Court noted before, Lessard at the very least has knowledge about the customers he serviced while employed by Western.  And while Lessard denies that he possesses a customer list, he was able to produce a list of counties in which he worked during the two years preceding his termination.  He was thus forced to admit during the preliminary injunction hearing that he possesses in his calendar the address

---

[3] Because Lessard's employment agreement contains a New Jersey choice-of-law provision, New Jersey law applies to Plaintiff's breach of contract claim. (*See* Mem. Op. at 13.)

of each Western customer he serviced two years prior to his termination. The Court sees no practical distinction between this information and a customer list.

The Court similarly discounts Lessard's claim that he was not privy to pricing information while he was employed at Western.[4] At the preliminary injunction hearing, Sullivan testified that Lessard set the initial pricing for canine bedbug inspections, and that Western's pricing is neither public nor standardized. While the initial pricing might change due to negotiation, Pamela Woods, who is Sullivan's Administrative Assistant, testified that she sent Lessard his schedules, which included copies of the final contracts executed by the customers whose premises Lessard was to inspect. According to Woods, these contracts included final pricing. Lessard admitted that the schedules he received "sometimes" included pricing information, but claimed he did not look at it -- a claim the Court does not find believable. The Court therefore finds it likely that Lessard possesses confidential information as a result of his employment at Western. In cases where the employer's interests are strong, such as cases involving

---

[4] Defendants claim that Western has not safeguarded its pricing information, pointing out that one of Western's media placements indicates that prices "start at $300." (Opp. at 11 (citing Petouvis Decl. [Dkt. 5-3] Ex. D).) However, the very same article indicates that pricing depends on the type of building, the number of rooms, and how long it takes the dog to perform the inspection. This is consistent with Sullivan's testimony that pricing is nonstandard and depends on the nuances of the job. The Court will not conclude based on a publicly available starting price that *all* of Western's pricing information is public or that Western has failed to take adequate measures to protect such information.

confidential information, a court will enforce a noncompetition agreement. *See Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 542 A.2d 879, 893 (N.J. 1988).

Defendants also argue that the non-compete provision is excessive. According to Lessard's Declaration, he performed just one inspection in Connecticut, one in Delaware, one in New York, and six in New Jersey. As the Court stated earlier, the geographic scope of the non-compete provision is broad, barring Lessard from working in a state even if he worked in just one county therein. However, at this point, Western only seeks to enjoin Lessard from competing against it in the counties in which he worked for Western in the two years preceding his termination. That said, it was emphasized at the preliminary injunction hearing that Lessard only performed one inspection in New York City, obviously a large market. Indeed, according to Lessard's Declaration and a press release submitted as an exhibit, New York City was the most "bedbug-infested" city in 2011. (Lessard Decl. Ex. I [Dkt. 29-10].) As such, the Court concludes that it would be unreasonable to preclude Lessard from providing canine bedbug detection services in New York City based solely on the one inspection he performed there for Western. With this one modification, the Court finds the non-compete provision, when enforced at a county-level, reasonable.

The Court also finds it likely that Lessard has violated the non-compete provision of his employment agreement. Defendants argue that Lessard did not engage in unauthorized moonlighting while employed at Western, focusing exclusively on Lessard's training of bedbug scent dogs and the fact that he sold one such dog to a buyer other than Western -- a fact about which Sullivan apparently became aware. (Opp. [Dkt. 29] at 7-9.) This activity is not, however, the sole support for Plaintiff's breach of contract claim. Indeed, Lessard acknowledged at the preliminary injunction hearing that he performed a bedbug scent inspection on behalf of American Canine Scent Detection ("ACSD") at an apartment complex in Maryland in August 2011 -- a time when he was employed at Western. This activity clearly falls within the ambit of the non-compete provision, and is conveniently ignored in Defendants' opposition. Finally, Plaintiff alleges that Lessard's breach of his employment agreement has caused it damages, including the loss of goodwill. For these reasons, the Court finds it likely that Plaintiff's breach of contract claim will succeed on the merits.

      B.    <u>Irreparable Harm</u>

The plaintiff must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama*, 575 F.3d at 347 (emphasis added).

"[G]enerally 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)). "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* at 552 (citation omitted). Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).

Plaintiff argues that the loss of future business and customer goodwill absent the prohibitive injunctive relief it seeks cannot readily be quantified. Courts have held that "loss of clients' goodwill and future business . . . [is] difficult, if not impossible, to measure fully." *Fidelity Global Brokerage Grp., Inc. v. Gray*, No. 1:10cv1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (quoting *IDS v. Sun Am.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997)); *see also Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) ("[R]elations with customers and investors, [and] the good will built up by a heretofore successful enterprise" is "incalculable

not incalculably great or small, just incalculable.";
*Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977) (holding that the award of damages based on "past profits" would not adequately compensate plaintiff for harm to goodwill, which was "incalculable"), *abrogated on other grounds*, *Real Truth About Obama*, 575 F.3d at 346.

The Court concludes that Plaintiff has made a sufficient showing it will suffer irreparable harm if Lessard violates the non-compete provision of his employment agreement. As discussed above, the Court is satisfied based on the record before it that Lessard possesses confidential information about customers and was privy to confidential information regarding pricing. Moreover, while Lessard apparently trained dogs before his employment at Western, his resume indicates that he did not begin to engage in canine bedbug scent detection until 2009 -- the year he began work at Western. He also acknowledges that Western paid for he and Dixie to be trained by the academy in Florida. *See ISCO Indus., LLC v. Erdle*, No. 5:11-cv-552, 2011 WL 5101599, at *3-4 (E.D.N.C. Oct. 26, 2011) (finding irreparable harm and ordering defendant to comply with noncompetition agreement where plaintiff contended that it "made significant investments of time and money into training [defendant] to become knowledgeable about its business, products, and capabilities" and defendant "inevitably had access

to detailed, confidential information relating to [plaintiff's] operations, sales, and marketing strategies"). As discussed in its Opinion, the Court again notes that Lessard is in a unique position relative to Western given the media placements it put forth promoting him and Dixie. *See Rauch Indus., Inc. v. Radko*, No. 3:07-cv-197, 2007 WL 3124647, at *2 (W.D.N.C. Oct. 25, 2007) (noting that alleged breach of non-compete agreement was likely to cause irreparable harm given the defendant's unique relationship with the plaintiff).

Defendants argue that monetary damages would sufficiently compensate Plaintiff. However, Defendants fail to address Fourth Circuit case law holding that harm to customer goodwill and loss of future business are sufficient for purposes of demonstrating irreparable harm. These are the sorts of harm that are likely to occur if Lessard engages in unfettered competition against Western and uses Western's confidential information against it. In sum, the Court finds that Plaintiff has made a clear showing that it will suffer irreparable harm if it is not granted the prohibitive injunctive relief it seeks.[5]

---

[5] The Court also notes that the employment agreement signed by Lessard stipulated that he would acquire confidential information in the course of his employment and that Western would suffer "great and irreparable loss and damage" if he were to breach the non-solicitation and non-compete provisions. Though certainly not dispositive, such a stipulation may constitute evidence of irreparable harm. *See Trico Equip., Inc. v. Manor*, No. 2009 WL 1687391, at *9 (D.N.J. June 15, 2009); *Nat'l League of Junior Cotillions, Inc. v. Porter*, No. 3:06-cv-508, 2007 WL 2316823, at *3 n.9 (W.D.N.C. Aug. 9, 2007).

### C. Balance of Equities/Public Interest

In balancing the equities, the Court finds that the harm to Plaintiff substantially outweighs the harm to Defendants. As the Court stated in its Opinion, if Lessard is contractually barred from using Plaintiff's confidential information and operating a canine bedbug detection business in the same geographic region as Plaintiff, then he loses nothing from an injunction prohibiting him from doing so. And, at this time Western is not seeking to enforce the non-compete provision to its full extent but rather asks that Lessard be enjoined from providing canine bedbug detection services in the counties where he worked during the two-year period preceding his termination. As discussed above, the Court has further narrowed the reach of the non-compete provision by excluding New York City from its geographical scope.

Defendants exaggerate the level of harm they will incur if prohibitive injunctive relief is granted. First, the preliminary injunction sought does not preclude Lessard's wife from operating ACSD. Moreover, an article on ACSD's website indicates that ACSD has searched over 70,000 rooms (Petouvis Decl. [Dkt. 5-3] Ex. E at 13), which strikes the Court as a substantial amount of business given the company's relatively recent inception (the middle of 2010 according to Lessard's testimony). Second, Lessard is not enjoined from operating his

kennel nor is he enjoined from breeding, boarding or training dogs. Indeed, it is in these activities that the bulk of Lessard's past experience appears to lie. Lessard's claim that he has gained "limited earnings" (approximately $2,000) from what he terms "proscribed" activities (Opp. at 6) further cuts against his argument that he will suffer extreme harm if he is enjoined from competing against Western within the geographic scope discussed above. Plaintiff, on the other hand, argues that it will lose significant business if Lessard continues to misappropriate and dilute its goodwill in contravention of his employment agreement.

Lastly, the "public interest favors the protection of confidential business information and the enforcement of valid contracts." *ABT, Inc. v. Juszczyk,* No. 5:09cv119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010). In sum, the balance of equities and the public interest both warrant an injunction precluding Lessard from violating his employment agreement.

## IV. Conclusion

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion. The Court will grant Plaintiff's Motion insofar as it seeks to enjoin Lessard from engaging in the canine bedbug scent detection business in the cities and counties where he worked during the two years prior to his termination (with the exception of New York City) and to

enjoin Lessard from sharing confidential information in violation of his employment agreement.  The Court will deny Plaintiff's Motion insofar as it requests possession of Dixie.

An appropriate Order will issue.

|  |  /s/  |
|---|---|
| March 21, 2012 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |